**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALSTOM POWER, INC., | ) |
| | ) |
| Plaintiff/ Counterclaim Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| RMF INDUSTRIAL CONTRACTING, | ) |
| INC., | ) |
| | ) |
| Defendant/ Counterclaim Plaintiff. | ) |

**2:03cv627**
**2:03cv1050**

**Consolidated at 2:03cv627**

| | |
|---|---|
| ALSTOM POWER, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AMERICAN INDUSTRIAL ASSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER OF COURT**

Before the Court for consideration and disposition is PLAINTIFF ALSTOM POWER, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT, with attached brief in support ("Motion" and "Brief") (*Document No. 37*). The issues have been fully briefed, and the matter is ripe for disposition. *See* Document Nos. 44 & 49. For the reasons which follow, the Motion will be granted in part and denied in part.

Background

Plaintiff Alstom Power, Inc. ("Alstom") entered into a consortium with Duke/ Flour Daniel ("DFD," and collectively "the Consortium") to submit a bid to Reliant Energy for the construction of a coal-fired power plant at the site of the existing Seward Power Plant in Indiana County, Pennsylvania (the "Project"). Pltf's Stmt. of Facts at ¶ 1. Reliant Energy accepted the Consortium's bid. *Id.* at ¶ 2. On January 17, 2001, Reliant Energy and the Consortium entered into an engineering, procurement and construction contract (the "EPC Contract"). *Id.* The

guaranteed completion date for the Project was May 1, 2004. *Id.* Under the EPC Contract, the Consortium agreed to provide engineering, procurement, construction, startup, demonstration and testing for the repowering of the existing Seward Power Plant. *Id.* at ¶ 3. The repowering of the Seward Power Plant was to be accomplished by constructing a new power plant adjacent to the existing facility which would incorporate the existing exhaust stack from the old plant. *Id.* at ¶ 4.

Under the EPC Agreement, Alstom was responsible for designing, procuring and constructing two new Circulating Fluidized Bed Boilers ("CFB Boilers") and other ancillary components. Pltf's Stmt. of Facts at ¶ 5. Alstom decided to subcontract the actual erection of the CFB Boilers, the ancillary equipment and the structural steel to other entities. *Id.* at ¶ 6. On August 3, 2001, Alstom sent a "Request for Quotation for the Mechanical Erection of Circulating Fluidized Bed Steam Generators and Ancillary Equipment" (the "RFQ") to defendant RMF Industrial Contracting, Inc. ("RMF") and other companies. *Id.* at ¶ 7. The RFQ solicited bids for the erection of the CFB Boilers and ancillary components. *Id.* The RFQ contained an Equipment Summary Sheet which identified the various components and the approximate quantities and weights of the components. *Id.* On August 24, 2001, Alstom sent to RMF and others an addendum ("the Addendum") to the RFQ which included a revised Equipment Summary Sheet. Pltf's Stmt. of Facts at ¶ 8.

RMF submitted a bid in response to the RFQ and the Addendum on September 20, 2001. *Id.* at ¶ 9. RMF's bid included the erection of the CFB Boilers and ancillary equipment for the price of $48,039,896.00. *Id.* According to John Miehle, RMF's lead estimator, RMF estimated the man hours necessary to complete its scope of work on the Project based on the quantities and weights listed in the revised Equipment Summary Sheet. *Id.* at ¶¶ 10-11. On November 2, 2001, Alstom issued a letter of award to RMF in which Alstom stated its intention to award a purchase order to RMF for the mechanical erection, *i.e.* the erection of the CFB Boilers and ancillary

2

equipment, for the price of $45,888,000.00.  *Id.* at ¶ 12.  On January 15, 2002,[1] RMF and Alstom

executed Purchase Order No. 73060 (the "Purchase Order" or "Agreement"), which provided that

RMF would erect the two CFB Boilers and ancillary equipment for the price of $46,168,000.00.

Pltf's Stmt. of Facts at ¶ 14.[2]  Additionally, Philip Services Corporation ("PSC"), RMF's parent

company, provided a $5,000,000.00 letter of credit (the "Letter of Credit") to Alstom.  *Id.* at ¶ 14.

The Purchase Order provided that RMF's work was to be completed by March 1, 2004,

but also provided that "said date may be adjusted by this Agreement."  RMF's Stmt. of Facts at ¶

15.  In the absence of any adjustments, RMF was required to achieve certain "milestones" by

certain dates: 25% complete by October 25, 2002; 50% complete by January 3, 2003; 75%

complete for Unit 2 by May 1, 2003; and 75% complete for Unit 1 by May 27, 2003.[3]  Pltf's

Stmt. of Facts at ¶ 16.

RMF personnel arrived at the site of the Project in January of 2002.  Pltf's Stmt. of Facts

at ¶ 19.  However, according to RMF the site was not properly prepared for RMF to proceed with

construction.  RMF's Stmt. of Facts at ¶ 19.  RMF contends that conditions at the site were

generally not good and did not improve, and that performance of its duties under the Purchase

Order was hampered by various problems.  Some of the problems were allegedly caused by

Alstom (*i.e.*, insufficient laydown area, lack of site maintenance, schedule delay and scope

growth), while others (*i.e.*, an extremely harsh winter) were beyond the control of anyone

involved with the Project.  *See* RMF's Brief at 2-3; RMF's Stmt. of Facts at ¶¶ 53-134

(describing RMF's difficulties with the Project).

---

[1]  The Purchase Order reflects acceptance by Alstom on January 15, 2001, but based on the timing of other relevant events the Court assumes that the date is a clerical error, and that the correct date is January 15, 2002.

[2]  The Purchase Order provides that the parties' agreement is governed by Pennsylvania law.  *See* Purchase Order, General Terms and Conditions, ¶ 24.3.

[3]  The parties' filings do not define or explain the relevance of "Unit 1" and "Unit 2," and these distinctions are apparently not significant to the resolution of the Motion for Summary Judgment.

It is undisputed that RMF experienced difficulties in the achievement of the "milestones" described above. RMF missed the 50% completion date (January 3, 2003), but contends that it was generally not at fault due to the problems encountered as mentioned above. Pltf's Stmt. of Facts at ¶ 21; RMF's Stmt. of Facts at ¶ 21. Additionally, William Harrington, RMF's Project Executive, testified that based upon "a certain scope of work" RMF was not on schedule in the Spring of 2003. RMF's Stmt. of Facts at ¶ 22.

An issue in this case is whether RMF properly followed the notice provisions established by the Purchase Order when alleged needs arose regarding additional work, additional costs, expenses and the like. During the course of RMF's performance, it submitted various letters to Alstom stating that it would request an extension of time to meet certain milestone dates. Pltf's Stmt. of Facts at ¶ 20. According to Alstom, there is no evidence that RMF ever submitted anything more than said letters with no supporting documentation which is not in conformance with the express requirements of the Purchase Order. *Id.* RMF, on the other hand, contends that it "provided Alstom with substantial notice and documentation of the problems it experienced on site." RMF's Stmt. of Facts at ¶ 20.

On February 20, 2003, after having experienced numerous problems and delays, RMF submitted an "as-impacted" schedule to Alstom which indicated that RMF would complete its scope of work on the Project six months later than contractually required. Pltf's Stmt. of Facts at ¶ 23. The "as-impacted" schedule was not meant to be a detailed schedule analysis, but RMF expected that submission to "start a dialogue" with Alstom regarding the problems that RMF had experienced. *Id.* at ¶ 33. On March 11, 2003, in response to RMF's "as-impacted" schedule, Alstom dispatched correspondence to RMF which stated, in part:

> Based on our analysis we have found that your "as impacted schedule" submittal fails to provide any justification for granting a time extension to RMF. In accordance with the contract the milestone dates remain unchanged unless and until you provide us with the proper bases for a time extension.

*Id.* at ¶ 36. RMF apparently interpreted this letter, as well as later communications, as a rejection of all of RMF's claims for schedule extension and additional compensation. *See* Harrington dep.

at 153, 332, 402-03.

Regarding its claims for scope growth, RMF submitted numerous Scope Change Order Notices[4] to Alstom in order to begin the contractually required process for adjustments to the contract price. RMF's Stmt. of Facts at ¶¶ 135-165. RMF did not submit a formal Scope Change Order Notice to request a six-month schedule extension. Pltf's Stmt. of Facts at ¶ 31. However, there is evidence that Alstom was informed on numerous occasions of the difficulties and schedule delays that RMF allegedly experienced due to a force majeure event, insufficient laydown area, lack of site maintenance, schedule delay and scope growth. *See* RMF's Brief at 9-11; RMF's Stmt. of Facts at ¶¶ 54-114, 119-134.

On April 7, 2003, Alstom notified RMF that it was in default of the Agreement. Pltf's Stmt. of Facts at ¶ 25. The notice of default specified that RMF failed to maintain a proper level of manpower at the site, and failed to provide a plan to restore progress and schedule compliance. *Id*. On April 23, 2003, James Boggs ("Boggs"), President of RMF, spoke with Gerald Barcikowski ("Barcikowski"), General Manager of Alstom, regarding the problems that RMF and Alstom experienced on the Project. Pltf's Stmt. of Facts at ¶ 26. The sum and substance of their conversation was as follows: Boggs asked Barcikowski whether additional money would be available to compensate RMF for its additional expenses (scope growth, the alleged force majeure event and the like), Barcikowski responded that at that time there was no conclusive evidence that RMF was entitled to additional compensation, and Boggs replied that without the possibility of additional compensation RMF would not continue to work. *See* RMF's Stmt. of Facts at ¶ 26; Pltf's Stmt. of Facts at ¶ 26. Apparently, as a result of this conversation, RMF began to demobilize from the site at the end of April, 2003. RMF's Stmt. of Facts at ¶ 27; Pltf's Stmt. of Facts at ¶ 27. By correspondence of April 30, 2003, Alstom terminated its Agreement with RMF. Pltf's Stmt. of Facts at ¶ 28. Among other alleged defaults, Alstom cited that its

---

[4] A "Scope Change Order Notice" is "a written notice to [Alstom] issued by [RMF] requesting Scope Change Order (*sic*) in connection with the performance of the Work." Purchase Order, General Terms and Conditions, § 1.1.

termination of RMF was due to RMF's failure to supply a sufficient number of skilled workers, materials and equipment to meet its required completion dates, and RMF's abandonment of its work on the Project. *Id*.[5]

RMF later delivered to Seward Trust[6] a notice of its intention to assert a mechanic's lien on the power plant property in an amount equivalent to that which RMF alleges Alstom owes RMF.  Complaint at ¶ 7; Answer at ¶ 7.  RMF followed through with its stated intention and filed two mechanic's liens on the power plant property in Indiana County in the amount of $35,900,000.00, but later RMF voluntarily reduced the lien amounts to $29,235,060.00.[7]  Alstom drew upon the letter of credit provided by PSC in the full amount of $5,000,000.00.  *See* RMF's Brief at 23-24.

On May 2, 2003, Alstom filed a Complaint against RMF for breach of contract at civil action number 03-627.  Alstom seeks "(i) recovery of damages caused by RMF's breaches and default under its purchase order with Alstom; and (ii) a declaration that RMF's notice of its intention to claim a mechanic's lien is legally and factually unsupported and, therefore, null and void."  Complaint at ¶ 8.  RMF filed an Answer and Counterclaim against Alstom for breach of contract (Count I), breach of contract - cardinal change (Count II), breach of implied warranty (Count III), breach of the implied covenant of good faith and fair dealing (Count IV), unjust enrichment (Count V), and violation of the Pennsylvania Contractor and Subcontractor Payment Act (Count VI).  In the instant Motion Alstom seeks summary judgment on RMF's claims for

---

[5]  James Duff, Alstom's scheduler on the project, testified that RMF was six (6) weeks behind schedule and slipping when RMF left the Project.  Pltf's Stmt. of Facts at ¶ 29.

[6]  Seward Trust merged with Reliant Energy in September of 2003.

[7]  The amount of each lien was $35,900,000.00.  At a status conference held on October 7, 2005, counsel for RMF represented to the Court that RMF had voluntarily lowered the amounts of the liens to $29,235,060.00 because RMF's subsequent investigation revealed that the higher number ($35,900,000.00) overstated the extra expenses incurred by RMF. Additionally, on February 16, 2006 the Court ordered RMF to reduce the amounts of its liens to no more than $7,244,021.89.  *See* Civil Action Number 03-1231, document no. 61.

breach of contract, breach of implied warranty, unjust enrichment and the alleged violation of the

Pennsylvania Contractor and Subcontractor Payment Act.  For the reasons which follow, the

Motion will be granted in part and denied in part.


Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

[Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

An issue of material fact is genuine only if the evidence is such that a reasonable jury

could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  The court must view the facts in a light most favorable to the non-moving party, and

the burden of establishing that no genuine issue of material fact exists rests with the movant.

*Celotex*, 477 U.S. at 323.  The "existence of disputed issues of material fact should be

ascertained by resolving all inferences, doubts and issues of credibility against the moving party."

*Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh*

*Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)).  Final credibility determinations on

material issues cannot be made in the context of a motion for summary judgment, nor can the

district court weigh the evidence.  *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir.

1993).

The task of interpreting a contract is a function of the court.  The goal of that task is to

ascertain the intent of the parties as manifested in the language of the written instrument.

*Standard Venetian Blind Co. v. American Empire Insurance Company*, 469 A.2d 563, 566

(1983).  An ambiguity exists when a questionable term or language, viewed in the context of the

entire contract, is reasonably susceptible of different constructions and capable of being

understood in more than one sense.  *J.C. Penney Life Insurance Co. v. Pilosi*, 393 F.3d 356, 360

(3d Cir. 2004).  However, a court should interpret the contract to avoid ambiguities and give

effect to all of its provisions, and refrain from torturing the language of a contract to create ambiguities where none exist. *Pilosi*, 393 F.3d at 363.[8]

Discussion

A.    Breach of Contract

     1.    Whether Alstom Properly Terminated the Agreement with RMF

Alstom contends that it properly terminated the Agreement, and therefore RMF cannot maintain its claim against Alstom for breach of contract. Alstom's Brief at 4. Specifically, Alstom contends that RMF was behind schedule, that RMF failed to substantiate its claim for an extension of time as required by Article 7 of the Purchase Order, and that Alstom properly terminated the Agreement because RMF was behind schedule and refused to make contractually required efforts to recover the schedule. *Id*.

It is undisputed that RMF was behind schedule at the time that Alstom terminated the Agreement. RMF's Stmt. of Facts at ¶ 22. However, as RMF points out, "[t]he Agreement makes clear that RMF is entitled to an adjustment of schedule or contract price when ALSTOM [or a force majeure event] is the cause of delays in RMF's performance." RMF's Brief at 5. RMF relies on the following two sections of Article 7 of the Purchase Order:

> 7.6    Effect of Force Majeure Event. In the event and to the extent that a Force Majeure Event affects [RMF's] ability to meet the Liquidated Damages dates, the Schedule of Values or the Unit Schedule, an equitable adjustment in one or more of the Liquidated Damages Date/s, the Schedule of Values, Contract Price and the Unit Schedule **shall be made** by agreement of [Alstom] and [RMF]. The adjustment in the Contract Price will take into account the reasonable and necessary costs incurred by [RMF] in the exercise of diligence to avoid or mitigate a Force Majeure Event.

---

[8] A federal court sitting in diversity must apply the substantive law as decided by the state's highest court. *Travelers Indem. Co. of Illinois v. DiBartolo*, 131 F.3d 343, 348 (3d Cir. 1997) (citation omitted).

Purchase Order, § 7.6 (emphasis added).[9]

> 7.7   Purchase-Caused Changes.  In the event and to the extent a failure of [Alstom] to perform, or cause performance of, its obligations in accordance with the Agreement causes a delay in [RMF's] performance of the Work which impairs [RMF's] ability to meet the Guaranteed Completion Date or Final Acceptance or adversely impacts [RMF's] cost of performance of the Work, an equitable adjustment in one or more of the Guaranteed Completion Date, the Schedule of Values, the Project Schedule or the Contract Price **shall be made** by agreement of [Alstom] and [RMF] pursuant to this Article 7.0.

Purchase Order, § 7.7 (emphasis added).

RMF's theory is that under these provisions it was entitled to an adjustment of the schedule and/or contract price in the event of delays caused by force majeure events or delays in performance of the work caused by Alstom.  RMF's Brief at 5.  The Court finds that RMF has articulated a viable theory which, if established, could excuse its undisputed failure to maintain the schedule and establish that it was not in breach of the Agreement.  The Court also finds that there is ample record evidence of a force majeure event and delays allegedly caused by Alstom to support RMF's theory that it was entitled to an adjustment of the schedule and/or contract price. *See* RMF's Brief at 6 (*citing* RMF's Stmt. of Facts at ¶¶ 57-118).  Therefore, the Court cannot grant summary judgment to Alstom on the grounds that RMF was behind schedule.

As mentioned above, Alstom also contends that RMF failed to substantiate its claim for an extension of time as required by Article 7 of the Purchase Order.  Specifically, Alstom argues that "[t]he Agreement clearly conditions RMF's right to time extension upon the timeliness and completeness of its notice and supporting documentation," and that "RMF failed to comply with these provisions because it never submitted a SCON requesting a significant schedule extension, accompanied by anything resembling reasonable supporting documentation."  Alstom's Brief at 6.  In response, RMF contends that Alstom misconstrues the requirements of the notice provision at issue, that RMF in fact provided sufficient notice to Alstom of its entitlement to an extension

---

[9]  Unlike other sections within Article 7, section 7.6 does not expressly indicate whether RMF was required to follow the procedures for obtaining a Scope Change Order in order to receive compensation for a Force Majeure Event.

of time, that Alstom waived compliance with the notice provision by acknowledging RMF's claims and impacts, reviewing the merits of RMF's claims, and itself ignoring the notice provisions.  RMF's Brief at 7.

The notice provision with which RMF allegedly did not comply states as follows:

> 7.3.1    As soon as [RMF] becomes aware of any circumstances which [RMF] has reason to believe may constitute a Scope Change, [RMF] shall issue to [Alstom] a Scope Change Order Notice at [RMF's] expense within five (5) working days of discovery of a scope change.  All Scope Change Order Notices shall include **preliminary documentation** sufficient to enable [Alstom] to determine (i) the factors necessitating the possibility of a Scope Change; (ii) the impact which the Scope Change is likely to have on the Contract Price; (iii) the impact which the Scope Change is likely to have on scheduling and the Substantial Completion Date; and (iv) such other information which [Alstom] may reasonably request in connection with such Scope Change (including, without limitation, material and labor cost information).

Purchase Order, § 7.3.1 (emphasis added).  Section 7.3.2 provides the next step of the process:

> If [Alstom] desires to make a Scope Change in response to a Scope Change Order Notice or otherwise, it shall submit a Scope Change Order Request to [RMF].  [RMF] shall promptly review the Scope Change Order Request and notify [Alstom] in writing of the options for implementing the proposed Scope Change ... and the effect, if any, each such option would have on each of the Contract Price, the Substantial Completion Date, the Schedule of Values, the Unit Schedule (*sic*).

Purchase Order, § 7.3.2.[10]  Section 7.3.3 provides for an additional step:

> "[i]f [Alstom] agrees that a Scope Change is in order and accepts statement of the effect of such Scope Change on the Contract Price, the Substantial Completion Date, the Schedule of Values, the Work Schedule or the guarantees, [Alstom] shall issue a Scope Change Order ..."

Purchase Order, § 7.3.3.

The Court finds that a genuine issue of material fact exists regarding whether RMF provided sufficient notice to Alstom of its entitlement to an extension of time.  There is evidence that RMF consistently informed Alstom of the difficulties it was experiencing with the project, including the need for an extension of time, and it may well be that RMF complied with Article 7 as well as it possibly could under the circumstances.  *See* RMF's Brief at 9-11; RMF's Stmt. of

---

[10]  A "Scope Change Order Request" is "a written proposal issued and signed by [Alstom] or requesting a Scope Change, submitted to [RMF] by [Alstom] or the pursuant (*sic*) to the terms of Section 7.3.2."  Purchase Order, General Terms and Conditions, § 1.1.

Facts at ¶¶ 54-114, 119-134.  The Court also finds that there is a genuine issue of material fact regarding whether Alstom waived compliance with the notice provisions by acknowledging RMF's claims and impacts, by reviewing the merits of those claims, and by informing RMF that its claims for scope growth and an extension of the schedule could not be finalized until RMF's work on the Project was complete.  *See* RMF's Brief at 12-14; RMF's Stmt. of Facts at ¶¶ 54-114, 119-134.  Additionally, Alstom has not brought to the Court's attention any provision in the Purchase Order which states that Alstom required strict compliance with the procedures established by Article 7, and Alstom's alleged failure to demand strict compliance with Article 7 somewhat undercuts its current attempt to rely upon those provisions.  Therefore, the Court will deny summary judgment to Alstom based on RMF's alleged failure to comply with Article 7.


       2.      <u>Whether Alstom Properly Refused to Compensate RMF for Scope Growth</u>

Alstom contends that RMF cannot recover for extra work it performed due to growth in the weight and/or quantity of certain components.  Alstom's Brief at 12.  Specifically, Alstom contends that RMF "did not comply with the change order notice provisions in the Agreement, and thus has waived its right to be compensated for this alleged extra work."  *Id*.  Alstom also contends that even if RMF complied with the applicable notice provisions, "the Agreement explicitly disallows recovery for quantity growth unless the growth is greater than 5% of the quantities stated in the Agreement."  *Id*.

Under Pennsylvania law notice provisions in construction contracts are generally enforced.  *See Allied Fire & Safety Equipment Co., Inc. v. Dick Enterprises, Inc.*, 972 F.Supp. 922, 929 (E.D. Pa. 1997).  The Court finds a genuine issue of fact regarding whether RMF adequately complied with the change order notice provisions in the Agreement.  There is evidence that RMF did, in fact, comply with the notice provisions of Article 7 by its submission of twenty-seven (27) Scope Change Order Notices from December 2002 through February 2003.  Pltf's Stmt. of Facts at ¶ 39.  Alstom found inaccuracies and other problems with many of the

Scope Change Order Notices and rejected some of them.  Pltf's Stmt. of Facts at ¶ 40; Harrington dep. at 82.  Significantly, the Purchase Order is silent regarding what steps should be taken if Alstom did not agree that a Scope Change was required in response to a Scope Change Order Notice.  *See* Purchase Order at §§ 7.3.1, 7.3.2.  Gerald Barcikowski, Alstom's General manager, testified at his deposition that at a March 27, 2003 meeting, Alstom informed RMF that Alstom would review RMF's claims for scope growth but would not change the payment terms of the Agreement.  Pltf's Stmt. of Facts at ¶ 24.  Additionally, there is some evidence that Alstom did not wish to evaluate the Scope Change Order Notices until the last one was submitted by RMF.  RMF's Stmt. of Facts at ¶ 46; Harrington dep. at 83.  Under the facts of these circumstances the Court finds that it is not appropriate to grant summary judgment due to RMF's alleged failure to substantiate its claims for scope growth under Article 7.

As the Court stated above, Alstom also contends that summary judgment on the scope growth claims is appropriate because "the Agreement explicitly disallows recovery for quantity growth unless the growth is greater than 5% of the quantities stated in the Agreement."  Alstom's Brief at 12.  The revised Equipment Summary Sheet identified the various components and the approximate quantities and weights of the components.  Pltf's Stmt. of Facts at ¶¶ 7-8.  The top of each page states as follows: "All quantities are for one (1) Unit (accuracy use + or - 5%)."  Alstom's appx., exh. 5.  The revised Equipment Summary Sheet also includes the following disclaimer:

> NOTE: THIS EQUIPMENT SUMMARY WAS PREPARED TO ASSIST CONTRACTORS IN THE PREPARATION OF INSTALLATION COSTS. THIS SUMMARY IDENTIFIES MAJOR PIECES OF EQUIPMENT , BUT DOES NOT LIST ALL WORK ACTIVITIES, NOR ASSEMBLY OR MISCELLANEOUS EQUIPMENT REQUIRED FOR INSTALLATION. **ACCURACY OF PLUS OR MINUS IS APPLIED TO THE AGGREGATE ONLY AND NOT PER LINE ITEM.**

Pltf's Stmt. of Facts at ¶¶ 7-8, 48 (emphasis added).

According to Alstom, the above-quoted language means that Alstom would reimburse RMF for scope growth for anything over and above a five percent increase, and that the

"aggregate" meant the "rollup" or total of all the systems in the entire Project, rather than component by component. *Id*. at ¶ 49.[11] Alstom also contends that the overall weight increase for all of the Scope Change Order Notices was only 3% over the total weights listed in the revised Equipment Summary Sheet, and therefore RMF is not entitled to be compensated for this growth in quantity. *Id*. at ¶ 50.

RMF contends, with no citation to record evidence, that the scope growth exceeded 5%. RMF's Stmt. of Facts at ¶ 50. This argument, which has no apparent evidentiary support, is not persuasive. RMF also contends that the meaning of "aggregate" is ambiguous because "some components are described by weight, some are described by square footage, some by linear foot, some by number of welds and some by number of items." RMF's Brief at 18-19. Alstom apparently looked only to the weight of the components when it concluded that the scope growth alleged by RMF did not exceed 5%. *See* Alstom's appx., exh. 53 ("the overall weight increase is about 3%, well within the cumulative weights dead band of +5%."). As RMF points out, the lack of a standard unit of measure makes it difficult, if not impossible, to determine when the "aggregate" of each and every item listed on the revised Equipment Summary Sheet would exceed 5%. Therefore, the Court finds an ambiguity and a genuine issue of material fact with respect to the proper calculation of the "aggregate." Accordingly, the Court declines to grant summary judgment on RMF's claims for scope growth.

3.    Whether RMF May Recover Damages for Hindrances and Delays

Alstom contends that damages for "hindrances and delays" due to 1) Alstom's failure to properly schedule and coordinate the structural steel and mechanical erection; 2) Alstom's decision to re-sequence the structural steel erection; and 3) Alstom's late issuance and excessive

---

[11] There is evidence that Alstom has consistently taken the position that RMF was not entitled to extra compensation for scope growth unless the growth exceeded 5% of the weights listed in the revised Equipment Summary Sheet. See Alstom's appx., exh. 43 (minutes of meetings between Alstom and RMF).

revisions to construction drawings are barred by the Agreement.  Paragraph 14.1 of the

Agreement's General Terms and Conditions provides as follows:

> The Contractor [RMF] expressly agrees that in undertaking to complete the Work
> within the time specified, it has made allowances for all hindrances and delays
> *related to normal construction activities which might usually be expected to occur
> in performing the Work*.  No claims shall be made by the Contractor for such
> hindrances and delays.

General Terms and Conditions, ¶ 14.1 (emphasis added).  This provision states the "general rule"

under the Purchase Order, but other specific provisions of the Purchase Order address delays

caused by force majeure events (¶ 7.6), delays caused by Alstom (¶ 7.7), and delays caused by

changes in laws, ordinances and the like (¶ 14.3).  Additionally, section 14.1 apparently does not

bar claims for hindrances and delays which are not "related to normal construction activities

which might usually be expected to occur in performing the Work."

RMF contends in its Brief that Alstom has misconstrued the nature of its claims, that it

has not asserted a claim for "delay" damages.  RMF's Brief at 19.  Instead, RMF asserts that it

seeks to recover additional costs incurred in the performance of "an expanded scope of work in a

compressed time frame." *Id*. at 20-21.  Additionally, RMF contends that it was "entitled to

adjustment of the schedule or contract price in the event of delays caused by ALSTOM or force

majeure events," and that Alstom's refusal to provide adjustments amounted to a breach of

sections 7.7 and 7.8 of the Purchase Order. *Id.* at 20.

The Court understands RMF's position to be that its claims simply do not arise out of

"hindrances and delays related to normal construction activities which might usually be expected

to occur in performing the Work."  Instead, RMF contends that its claims fall under other

provisions of the Purchase Order which expressly allow for an adjustment of the schedule or

contract price.  The Court finds and rules that RMF may not recover damages for "hindrances

and delays related to normal construction activities which might usually be expected to occur in

performing the Work."  However, it appears that there are issues of material fact as to what

constitutes "normal construction activities which might usually be expected" and whether the

conduct of Alstom was the cause of "hinderances and delays" in RMF's performance, the latter

of which may implicate recovery under other provisions of the Purchase Order.  Accordingly,

Alstom's request for summary judgment on RMF's breach of contract claims for damages due to

hinderances and delays will be denied.

 

4.    <u>Whether Alstom Properly Drew on the Letter of Credit</u>

The Counterclaim alleges as follows:

> In order to secure the performance of RMF's work, RMF's parent company,
> Philip Services Corporation ("PSC"), provided a guaranty secured by a $5 million
> letter of credit.  Despite Alstom's many material breaches and RMF's lawful and
> appropriate termination of the contract, Alstom drew on the letter of credit on
> April 29 [2003], which draw was honored by PSC's bank on April 30 [2003].
> RMF is obligated to reimburse PSC by reason of the draw, and demand has been
> made for it to do so.

Counterclaim at ¶¶ 75-77.

Alstom contends that RMF is not a party to the letter of credit, did not supply the letter of

credit and has adduced no evidence that it has suffered damages due to Alstom's draw upon the

letter of credit.  Alstom's Brief at 21.  Therefore, Alstom contends that "RMF has no standing to

assert that it is entitled to the return of the funds drawn against the letter of credit."  *Id*. (*citing*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Alstom also contends in its Reply

that "RMF has presented no evidence of a written agreement between RMF and PSC whereby

PSC has promised to act as a surety or guarantor, nor has it presented any other evidence of a

written agreement between RMF and PSC whereby PSC has promised to act as a surety or

guarantor, nor has it presented any other evidence of a current obligation RMF owes to PSC."

Alstom's reply at 5.

According to RMF, "as a result of ASLTOM's draw on the letter of credit issued by

Wells Fargo for PSC, RMF became immediately obligated to reimburse PSC for the amounts

paid to ALSTOM under the letter of credit,"[12] and therefore it "has suffered a concrete injury-in-fact which can be remedied in this litigation."  RMF's Brief at 24.  The Court finds and rules that the draw on the letter of credit is, *at least under RMF's theory,* an "injury in fact" to RMF, that there is a causal connection between the injury and the alleged breach of contract, and that it is likely that the injury will be redressed by a favorable decision in this case.  *Lujan*, 504 U.S. at 560-61.  Therefore, the Court finds that RMF theoretically has standing to assert a claim regarding the letter of credit.

Alstom's other contention, however, that there is no evidence of a written agreement between RMF and PSC whereby PSC has promised to act as a surety or guarantor, merits further discussion.  Under Pennsylvania law a promise to answer for the debt of another must be in writing.  33 P.S. § 3.  As Alstom points out, despite RMF's arguments, RMF has not directed the Court to any evidence, testimonial or documentary, which establishes that RMF owed (or owes) $5,000,000.00 to PSC due to Alstom's draw on the letter of credit.[13]  The Court agrees, and finds that there is no evidence that RMF is under any obligation to reimburse PSC for Alstom's draw on the letter of credit.  In other words, there is no evidence that RMF has actually suffered any loss or injury due to Alstom's draw on the letter of credit.[14]  Therefore, the Court will grant summary judgment to Alstom on this aspect of the breach of contract claim.

---

[12]  According to RMF, when Alstom drew on the letter of credit, Wells Fargo Bank paid Alstom and Wells Fargo Bank then removed $5 million from PSC's account.  RMF's brief at 23.  RMF asserts that at this time it became obligated to PSC for the $5 million paid on its behalf.  *Id.* at 24.

[13]  The letter of credit reflects that it was issued on the application of "Philip Services Corporation O.B.O. RMF Industrial Contracting, Inc.," which presumably means that the letter of credit was issued on behalf of RMF.  Alstom's appx., exh. 11.  However, this writing, as well as RMF's conclusory allegations, are insufficient to establish that RMF is obligated to reimburse PSC for the draw upon the letter of credit, and the writing is likewise insufficient to satisfy the requirements of 33 P.S. § 3.

[14]  Additionally, RMF has not argued that it has third party standing to assert any right PSC may have to recover the $5,000,000.00 from Alstom.  *See Pennsylvania Psychiatric Soc. v. Green Spring Health Services, Inc.*, 280 F.3d 278, 288-89 (3d Cir. 2002).

16

B.   Breach of Implied Warranty

Count III of the Counterclaim states that "by distributing the RFQ with the plans and specifications for the project, Alstom impliedly warranted [that] the Project was capable of being constructed within those plans and specifications."  Counterclaim at ¶ 87.  The Counterclaim further alleges that due to inadequate site conditions, quantity scope growth, and other interferences, "the project was not capable of being constructed pursuant to the means and methods of construction mandated by the plans and specifications contained in the RFQ, and the implied warranty made by Alstom was therefore breached."  *Id*. at ¶ 88.  Alstom contends that summary judgment should be granted on this claim because there is "no evidence that the plans and specifications were defective, or that the Project could not be built according to those plans and specifications."  Alstom's Brief at 22.  Alstom also contends that Count III is duplicative of RMF's claim for breach of contract.  *Id*.  RMF, on the other hand, cites *Ehlers-Noll, GmbH v. U.S.*, 34 Fed. Cl. 494 (Fed. Cl. 1995) for the proposition that "[a] person who provides construction specifications 'impliedly warrants that the specifications are possible to meet'," and that "if the specifications are impossible or commercially impracticable to meet, then the specifications are defective, and the government has breached its implied warranty of the specifications."  RMF's Brief at 24 (*quoting Ehlers-Noll*, 34 Fed. Cl. at 499).

In *Ehlers-Noll*, the only authority cited by RMF, the United States Court of Federal Claims applied "government contract law" to a dispute between the United States Army and a German contractor over the proper specifications of steel doors at a U.S. Army facility in Germany.  *Ehlers-Noll*, 34 Fed. Cl. at 495-96, 499.  This cited case is not based on Pennsylvania law, nor is it factually apposite.

It may well be, as RMF contends, that under the circumstances alleged to have developed it was impracticable to construct the project according to the plans and specifications contained

in the RFQ.[15]  However, in the context of construction plans, specifications and/or request for quotation, the Court has found no authority to support such a claim for breach of implied warranty under Pennsylvania law.  Therefore, the Court predicts that the Pennsylvania Supreme Court would decline to recognize a claim for breach of implied warranty based on construction plans, specifications, or request for quotation.  Accordingly, the Court will grant summary judgment in favor of Alstom on Count III of the Counterclaim.

C.      Unjust Enrichment

        Count V of the Counterclaim states that "[i]n the alternative, by refusing to compensate RMF for the work RMF performed on the Project, Alstom has been unjustly enriched." Counterclaim at ¶ 94.[16]  Alstom contends that "RMF cannot assert a claim of unjust enrichment in this case because an express contract governs the relationship between RMF and ALSTOM." Alstom's Brief at 22.  RMF, on the other hand, contends that if Alstom prevails at trial on its theory that RMF was in breach of the Agreement and was properly terminated, "RMF may be precluded from recovering under the Agreement," but nevertheless RMF "should be allowed to present its unjust enrichment claim to recover the value of the services it provided."  RMF's Brief at 25.

        Under Pennsylvania law, "[w]here an express contract already exists to define the parameters of the parties' respective duties, the parties may avail themselves of contract remedies and an equitable remedy for unjust enrichment cannot be deemed to exist." *Villoresi v. Femminella*, 856 A.2d 78, 84 (Pa. Super. Ct. 2004) (citation omitted); *see also Hershey Foods*

_____

[15]  There is some evidence that construction pursuant to the RFQ was impracticable.  *See* RMF's Brief at 25.

[16]  To prevail on a claim for unjust enrichment RMF must establish that 1) a benefit was conferred; 2) there was appreciation of the benefit; and 3) acceptance and retention of the benefit occurred under circumstances making it inequitable for the party that benefits to retain the benefit without restitution.  *Mill Run Associates v. Locke Property Co.*, Inc., 282 F. Supp. 2d 278, 292 (E.D. Pa. 2003) (citations omitted).

*Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987) ("Under Pennsylvania law, the quasi-contractual doctrine of unjust enrichment [is] inapplicable when the relationship between the parties is founded on a written agreement or express contract.") (citations and quotation marks omitted); *Gee v. Eberle*, 420 A.2d 1050 (Pa. Super. Ct. 1980) (holding that "[t]he doctrine of unjust enrichment is clearly 'inapplicable when the relationship between the parties is founded on a written agreement or express contract'") (citations omitted). Our court of appeals has also observed that under Pennsylvania law "[w]here an express contract governs the relationship of the parties, a party's recovery is limited to the measure provided in the express contract ..." *Hershey Foods Corp.*, 828 F.2d at 999 (*citing Murphy v. Haws & Burke*, 344 A.2d 543, 546 (1975)).

It is well-settled that under Pennsylvania law the foregoing is the "general rule" in actions for breach of contract. *See, e.g., ILM Systems, Inc. v. Suffolk Const. Co., Inc.*, 252 F. Supp. 2d 151, 162-63 (E.D. Pa. 2002) (plaintiff subcontractor's claim for unjust enrichment is defeated by the existence of the Subcontract; no counterclaim for breach of contract was asserted by the contractor). However, the Superior Court of Pennsylvania has recognized an exception to the general rule where, as here, both parties contend that the other has breached the contract.

RMF relies upon *Lancellotti v. Thomas*, 491 A.2d 117 (Pa. Super. Ct. 1985) for the proposition that under Pennsylvania law "a party who commits a breach of contract [*i.e.*, allegedly RMF] should be entitled to recover any benefit conferred in excess of the loss caused by its breach." RMF's Brief at 26. In *Lancellotti*, the Superior Court of Pennsylvania adopted section 374 of the Restatement (Second) of Contracts. Section 374 provides, in relevant part, that "if a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach." Restatement (Second) of Contracts § 374(1). In other words, "[t]he party who committed a breach should be entitled to recover 'any benefit ...

19

in excess of the loss that he has caused by his own breach.'" *Lancellotti*, 491 A.2d at 122 (*quoting* Restatement (Second) of Contracts § 374(1)).  Although the Supreme Court of Pennsylvania has not yet adopted section 374, the Superior Court has followed *Lancellotti* and applied the basic principle of section 374 on at least two occasions.  *See Sevast v. Kakouras*, 841 A.2d 1062, 1067 (Pa. Super. Ct. 2003) (explaining that section 374 "affords a breaching party restitution to the extent that he can establish that the value of his part-performance exceeds the loss suffered by the non-breaching party."); *Nikole, Inc. v. Klinger*, 603 A.2d 587 (Pa. Super. Ct. 1992) (stating that "if both contracting parties materially breach the contract, recovery, by either party, is limited to that benefit which is in excess of the loss said party has caused by his own breach.") (*quoting In re Spagnol Enterprises*, *Inc*., 81 B.R. 337, 353 (W.D. Pa. 1987) and *citing Lancellotti*, *supra*).

In light of the foregoing Pennsylvania Superior Court authorities, the Court predicts that the Supreme Court of Pennsylvania would adopt section 374 of the Restatement (Second) of Contracts.  The Court also predicts that the Supreme Court of Pennsylvania would hold that RMF may have a claim for unjust enrichment, or "restitution,"[17] if the evidence at trial demonstrates that RMF has breached its contract, but nevertheless has conferred a benefit upon Alstom in excess of the loss caused by its own breach.  Therefore, the Court will decline to grant summary judgment in favor of Alstom on Count V of the Counterclaim.

D.    Alleged Violation of the Pennsylvania Contractor and Subcontractor Payment Act

Count VI of the Counterclaim states that "[d]espite repeated demand, Alstom refused and continues to refuse to pay invoices for services rendered that RMF has properly submitted to it for payment," in violation of the Pennsylvania Contractor and Subcontractor Payment Act, 73 Pa.

---

[17]  RMF pleads Count V as "unjust enrichment," but the cases cited above speak in terms of a right to "restitution."  In the spirit of the Federal Rules of Civil Procedure, the Court looks to the substance of Count V, rather than the form, in concluding that RMF may have a claim for "restitution" even though it has styled its claim as "unjust enrichment."

C.S.A. § 501 *et. seq*. (the "Act").  Counterclaim at ¶ 96.  The Act provides, *inter alia*, that "[p]erformance by a subcontractor in accordance with the provisions of the contract shall entitle the subcontractor to payment from the party with whom the subcontractor has contracted."  73 Pa. C.S.A. § 507(a).  "When a subcontractor has performed in accordance with ... the contract," the contractor must pay the subcontractor within "14 days after receipt of each progress or final payment or 14 days after receipt of the subcontractor's invoice, whichever is later."  73 Pa. C.S.A. § 507(c).  "Payment shall be made under [section 507] unless it is being withheld under section 11," which provides that "[t]he contractor or subcontractor may withhold payment from any subcontractor responsible for a deficiency item."[18]  73 Pa. C.S.A. §§ 507(c), 511(a). Additionally, a contractor may withhold payment "to the extent it bears a reasonable relation to the value of any claim held in good faith by the owner, contractor or subcontractor against whom the contractor or subcontractor is seeking to recover payment."  73 Pa. C.S.A. § 512(a).  Finally, if a contractor violates the Act, a subcontractor may recover a penalty, interest of one percent per month on the amount wrongfully withheld, and "the substantially prevailing party in any proceeding to recover any payment ... shall be awarded a reasonable attorney fee."  73 Pa. C.S.A. § 512.

Alstom contends that it has not violated the Act because it "paid all invoices for progress payments submitted by RMF until RMF materially breached the Agreement," and that it "also paid all invoices for change orders and other conditional payments submitted by RMF which were not in dispute and/or were not erroneous."  Alstom's Brief at 23.  RMF asserts that "[t]he question of whether ALSTOM is justified in claiming these amounts are disputed is a question of fact that cannot be resolved at this procedural stage."  RMF's Brief at 27.  The specific payments

---

[18]  "Deficiency item" is defined as "[w]ork performed but which the owner, the contractor or the inspector will not certify as being completed according to the specifications of a construction contract."  73 Pa. C.S.A. § 502.

at issue are the three (3) final invoices for progress payments under the Agreement[19] and an invoice for quantity scope growth on February 10, 2003 in the amount of $7,771,966.20.[20] Alstom's Brief at 24-25; RMF's Brief at 27.

The central issues in this claim are whether Alstom withheld payment on the four (4) disputed invoices in good faith, and whether the amount withheld bears a reasonable relationship to the value of Alstom's claims. *See Joseph F. Cappelli & Sons, Inc. v. Keystone Custom Homes, Inc.*, 815 A.2d 643, 647 (Pa. Super. Ct. 2003) (the Act "permits owners to withhold payment, without incurring penalties under the Act, for good faith claims for 'deficiency items.'").  As the Court has already discussed, there are genuine disputes of material fact in this case regarding whether Alstom, RMF, or both breached the Agreement.  In turn, these genuine disputes of material fact also require that a jury determine whether Alstom has withheld payment on the four (4) disputed invoices in good faith, and whether the amount withheld bears a reasonable relationship to the value of Alstom's claims.  Accordingly, the Court will deny summary judgment to Alstom on Count VI of the Counterclaim.

### Conclusion

For the reasons hereinabove stated, Plaintiff Alstom Power, Inc.'s Motion for Partial Summary Judgment will be granted in part and denied in part.  An appropriate Order follows.

McVerry, J.

---

[19]  The earlier invoices were paid by Alstom; the three which have not been paid "were due after ALSTOM had notified RMF that RMF was in material breach of the Agreement on April 7, 2003, and after ALSTOM had given notice of termination to RMF, and after RMF had left the project." Alstom's Brief at 24.

[20]  RMF's subsequently prepared expert report now claims $4,492,951.00 in scope growth damages, rather than $7,771,966.20.  Alstom's Brief at 25.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALSTOM POWER, INC.,** ) | |
| ) | |
| **Plaintiff/ Counterclaim Defendant,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **RMF INDUSTRIAL CONTRACTING,** ) | |
| **INC.,** ) | |
| ) | |
| **Defendant/ Counterclaim Plaintiff.** ) | |
| _____ ) | **2:03cv627** |
| **ALSTOM POWER, INC.,** ) | |
| ) | |
| **Plaintiff**, ) | |
| ) | |
| **v.** ) | |
| ) | |
| **AMERICAN INDUSTRIAL ASSURANCE** ) | |
| **COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>ORDER OF COURT</u>

AND NOW, this 2nd day of March, 2006, it is hereby ORDERED, ADJUDGED and
DECREED that Plaintiff Alstom Power, Inc.'s Motion for Partial Summary Judgment
(*Document No. 37*) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

1. Summary judgment is **GRANTED** as to RMF's claim on the $5,000,000.00 letter
of credit; and **DENIED** as to all other claims in Count I of the Counterclaim
(breach of contract);

2. Summary judgment is **GRANTED** as to Count III of the Counterclaim (breach of
implied warranty);

3. Summary judgment is **DENIED** as to Count V of the Counterclaim (unjust
enrichment); and

4. Summary judgment is **DENIED** as to Count VI of the Counterclaim (alleged
violation of the Pennsylvania Contractor and Subcontractor Payment Act).

s/ Terrence F. McVerry
United States District Court Judge

cc:    Brian W. Ashbaugh, Esquire
Email: bashbaugh@blumlinggusky.com

Robert J. Blumling, Esquire
Kenneth Bradley Mellor, Esquire
Email: bmellor@blumlinggusky.com

Gerald J. Stubenhofer, Esquire
Email: gstubenhofer@mcguirewoods.com

Kevin S. Batik, Esquire
Email: kbatik@mcguirewoods.com

Ronald W. Crouch, Esquire
Email: rcrouch@mcguirewoods.com

George Anthony Smith, Esquire
Thomas P. Wilson, Esquire
Email: TWilson@KilpatrickStockton.com

Chad V. Theriot, Esquire
Frank L. Bigelis, Esquire
Hayley R. Ambler, Esquire
Email: HAmbler@KilpatrickStockton.com